UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 MAY 28 P 12: 19

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| GERBER RADIO SUPPLY CO., INC. d/b/a GERBER ELECTRONICS, <br><br> Plaintiff, <br><br> vs. <br><br> CINCH CONNECTORS, INC., <br><br> Defendant. | Civil Action No. 04-10724 RGS |

**Plaintiff Gerber Electronics's Opposition to
Defendant Cinch Connectors's Motion to Dismiss**

### Introduction

The plaintiff Gerber Radio Supply Co., Inc. d.b.a. Gerber Electronics ("Gerber") files this Opposition to defendant, Cinch Connectors's ("Cinch") Motion to Dismiss.

### Statement of Facts

Gerber is a Massachusetts corporation with a usual place of business in Norwood, Massachusetss. Gerber is a distributor of electronics components, including, among other things, cables and connectors.

Cinch is, upon information and belief, a corporation headquartered in Illinois. Cinch is the manufacturer of, among other things, cables and connectors.

Gerber was the distributor of Cinch products for at least 22 years, from 1980 through 2002.

On or about May 8, 1980, TRW, Inc. and Gerber entered into a Distributorship Agreement ("the Agreement"). The Agreement, which is attached hereto as *Exhibit 1*, provides,

1

in relevant part, "TRW hereby appoints Distributor [Gerber] on a non-exclusive basis as a TRW Authorized Electronic Components Distributor..."

At the time of the execution of the Agreement, Cinch Connectors was a division of TRW, Inc.

In or about November 1987, Labinal Components and Systems, Inc. ("LCS") entered into an agreement with TRW, Inc. for the purchase of the Cinch Connectors division of TRW.

On or about October 27, 1987, Gerber received correspondence from LCS indicating LCS's intention to continue Gerber's appointment as distributor for the products manufactured by Cinch Connector.

On or about October 29, 1987, Gerber received correspondence from TRW indicating Gerber's contract for distribution of Cinch Connector products to would be assigned to LCS.

Enclosed with the October 29, 1987 correspondence from TRW was an Assignment and Assumption Agreement ("Assumption Agreement"). The Assumption Agreement states, "There is a valid Distributor Agreement dated May 8, 1980... presently in existence between ASSIGNOR [TRW] herein and Gerber Radio Supply, Inc..."

The Assumption Agreement further states, "The ASSIGNEE [LCS], its successors and assigns, agree to be fully bound by the terms and conditions of said [May 8, 1980] Agreement and to perform pursuant to said terms and conditions."

On or about November 17, 2000, Cinch proposed to Gerber a revised Distributorship Agreement ("2000 Agreement" attached hereto as *Exhibit 2*).

The 2000 Agreement was virtually identical to the Agreement in all relevant provisions.

The 2000 Agreement was apparently not signed by either party.

From on or about May 10, 1980 through November 21, 2002, the parties conducted their business relationship pursuant to the terms of the Agreement.

On November 21, 2002, pursuant to Section 27.2 of the Agreement, Gerber terminated the Agreement solely for the convenience of the terminating party by giving at least thirty (30) days' advance notice in writing of its election to do so.

Section 28.1 of the Agreement provided:

If this Agreement is terminated under the provisions of Section 26.2, TRW will repurchase Distributor's unsold inventory of Program Products subject to the conditions of Section 30.0 and the following conditions:

> . . . (b) If Distributor terminates, Distributor will be paid in accordance with Section 30.5 for Program Products less a ten percent (10%) restocking charge.

Section 30.2 of the Agreement provided:

Such Program Products will not be obsolete or damaged and shall be in good, clean and resalable condition.

On November 21, 2002, pursuant to Section 30.5 of the Agreement, Gerber sent Cinch a list of inventory Gerber had purchased from Cinch, showing items, quantities and price substantiation, seeking to return eligible inventory to Cinch.[1]

In total, Gerber listed inventory for which it had paid $99,393.59. Seventy seven Thousand, Nine Hundred and Fifty Dollars and Thirty Five Cents ($77,950.35) of this inventory was still listed for sale in a price list issued by Cinch on November 15, 2002, i.e. only seven (7) days prior to the date of termination. All of this inventory was Program Product in good, clean and resalable condition.

---

[1] Gerber terminated the Agreement in accordance with Section 26.2 of the 2000 Proposal, which is identical to Section 30.2 of the Agreement. In all relevant provisions, the Agreement is virtually identical to the 2000 Proposal.

Cinch refused to repurchase Gerber's inventory upon Gerber's termination of the Agreement.

## Argument

I. THE MOTION TO DISMISS SHOULD BE DENIED BECAUSE GERBER'S AMENDED COMPLAINT SPECIFIES THAT A SIGNED, WRITTEN CONTRACT BETWEEN THE PARTIES EXISTS.

The defendant, Cinch, relies solely on the premise that the alleged lack of a signed written contract between the parties renders Gerber's Complaint without merit. While, as noted in subsequent paragraphs hereof, the defendant's argument is hardly persuasive, its underpinnings have now been removed by virtue of the proposed Amended Complaint filed by this date by Gerber.

Attached to said Amended Complaint is an executed contract signed by the defendant's predecessor in interest, containing virtually the exact same provision regarding the return of inventory upon termination as that contained in the 1994 Distributorship Agreement relied upon in Gerber's original Complaint. The defendant's entire argument upon which it relies in its Motion to Dismiss is thus obviated.

II. REGARDLESS OF THE EXISTENCE OF A WRITTEN CONTRACT, THE MOTION TO DISMISS SHOULD BE DENIED BECAUSE, AS A MATTER OF LAW, THE PARTIES OPERATED UNDER THE TERMS OF THE AGREEMENT AND CINCH IS THUS BOUND THEREBY.

Even if it is determined that the Agreement signed by Gerber and Cinch's predecessors in interest in 1980 is not controlling, Cinch is bound by the terms of the 2000 Agreement because the parties operated under the terms of that agreement. The 2000 Agreement stipulates that "... all disputes hereunder shall be settled in accordance with the laws of the State of Illinois..." *2000*

*Agreement*, p. 25. Under Illinois law, "The law is well-settled that, as to contracts generally, a party named in the contract may by his acts and conduct become bound by its provisions even though he has not signed it. [Citations]." *Soelzer v. Soelzer*, 47 N.E.2d 458, 460 (Ill. 1943) (acts and conduct of adopting parent validated unsigned adoption contract); *Calo, Inc. v. AMF Pinspotters, Inc.*, 176 N.E. 2d 1, 18-19 (Ill. App. 1961) (holding complaint sufficiently alleged a cause of action although sellers had not signed the contract, where buyer had offered to purchase equipment and sellers had accepted by accepting payment); *Skelton v. General Motors*, 860 F.2d 250, 259 (7th Cir. 1988) ("Although [party] was not a signatory to [agreement], his conduct binds him to the agreement."); *Amelco Elec. Co. v. Arcole Midwest Corp.*, 351 N.E.2d 349, 354 (Ill. 1976) (subcontractor who did not sign contract was bound because he did not object to its terms and acted on it). Cinch's conduct binds it to the terms of the Agreement.

During the entire course of their commercial relationship, the parties acted under the terms of the Agreement. Pursuant to the terms of the Agreement and/or the 2000 Agreement, Gerber performed in accord with all substantive provisions of the Agreement, including, but not limited to, the following:

- Gerber promoted and sold Cinch Products, and maintained an aggressive sales organization, adequate inventory and facilities to assure optimum distribution of the Cinch Products. *Affidavit of Robert J. Gerber ¶ 16; see Agreement ¶ 2.1; 2000 Agreement ¶ 2.1.*

- Gerber provided marketing services and solicit[ed] orders from the purchasing organizations of all potential customers where Cinch concentrates its sales efforts and identfied specific customers representing significant business potential in cooperation with Cinch's field and sales personnel. *Affidavit of Robert J. Gerber ¶ 17; see Agreement ¶ 2.2.2; 2000 Agreement ¶ 2.2.2.*

- Gerber maintained inventories of Cinch products consistent with marketing requirements and sound business practices. *Affidavit of Robert J. Gerber ¶ 18; see Agreement ¶ 2.2.4; 2000 Agreement ¶ 2.2.4.*

- Cinch did from time to time make recommendations to Gerber relating to inventory levels and inventory adjustments. *Affidavit of Robert J. Gerber ¶ 19; see Agreement ¶ 2.2.4; 2000 Agreement ¶ 2.2.4.*

- Gerber provided all necessary customer support order service and product information service. *Affidavit of Robert J. Gerber ¶ 20; see Agreement ¶ 2.2.5; 2000 Agreement ¶ 2.2.5.*

- Cinch furnished Gerber with current Cinch AD Price Lists and Cinch Suggested Resale Price Schedules for Cinch Program Products. *Affidavit of Robert J. Gerber ¶ 21; see Agreement ¶ 4.2; 2000 Agreement ¶ 4.2.*

- Cinch notified Gerber not less than thirty (30) days in advance of the effective date of increases in the prices set forth in the Cinch AD Price List. *Affidavit of Robert J. Gerber ¶ 22; see Agreement ¶ 5.1; 2000 Agreement ¶ 5.1.*

- Cinch notified Gerber that a new product lines were being offered to Gerber as part of overall promotional campaigns to introduce such products to the marketplace, and Cinch informed Gerber in writing that the products were part of a new or expanded program and provided all pertinent information, and Cinch submitted to Gerber a list of items and quantities thereof which, in Cinch's opinion, represented minimum inventories to be purchased by Gerber. *Affidavit of Robert J. Gerber ¶ 23; see Agreement ¶ 9.3; 2000 Agreement ¶ 6.2.*

- When Gerber did not provide Cinch with a Purchase Order [written confirmation] of telephone orders, Cinch's invoice for materials shipped was deemed confirmation and acceptance of such orders. *Affidavit of Robert J. Gerber ¶ 24; see Agreement ¶ 12.0; 2000 Agreement ¶ 11.0.*

- Cinch repaired, corrected or replaced any product or part thereof which, in the opinion of Cinch, was defective in workmanship or material. *Affidavit of Robert J. Gerber ¶ 25; see Agreement ¶ 14.1; 2000 Agreement ¶ 13.0.*

- Gerber made all claims for lost or damaged shipments directly to the carrier, and Cinch assisted Gerber in processing claims by providing information. *Affidavit of Robert J. Gerber ¶ 26; see Agreement ¶ 16.1; 2000 Agreement ¶ 15.1.*

- Materials were returned only after Cinch issued Gerber a Return Authorization to return products. *Affidavit of Robert J. Gerber ¶ 27; see Agreement ¶ 17.0; 2000 Agreement ¶ 16.1.*

- Gerber provided Cinch with monthly point-of-sale reports showing details of Gerber's sales of Cinch products and periodic inventory reports showing details of Gerber's inventory of Cinch products. *Affidavit of Robert J. Gerber ¶ 28; see Agreement ¶ 18.2; 2000 Agreement ¶ 17.0.*

- Gerber did not acquire or attempt to acquire the Cinch Products other than from Cinch pursuant to the Agreement. *Affidavit of Robert J. Gerber ¶ 29; see Agreement ¶ 22.0; 2000 Agreement ¶ 22.2.*

- Gerber maintained Products in the packaging provided by Cinch. *Affidavit of Robert J. Gerber ¶ 30; see Agreement ¶ 23.0; 2000 Agreement ¶ 22.3.*

- Cinch made periodic inspections of its inventory of Program Products and of Gerber's compliance with any special controls associated with Qualified Products. *Affidavit of Robert J. Gerber ¶ 31; see Agreement ¶ 23.0; 2000 Agreement ¶ 22.6.*

- Cinch provided Gerber with Cinch AD Price Lists and Cinch Suggested Resale Price Schedules for Program Products. *Affidavit of Robert J. Gerber ¶ 32; see Agreement ¶ 24.0; 2000 Agreement ¶ 23.1.*

- Cinch provided Gerber with reasonable quantities of catalogs, literature, product data and other printed material designed to aid in the sale of Program Products. *Affidavit of Robert J. Gerber ¶ 33; see Agreement ¶ 24.0; 2000 Agreement ¶ 23.2.*

- Cinch provided assistance in formulating Gerber's advertising and merchandising programs, and supplied display samples, photographs, copies of existing artwork and logotypes for use in advertising or promoting Program Products at no cost to Gerber. *Affidavit of Robert J. Gerber ¶ 34; see Agreement ¶ 24.0; 2000 Agreement ¶ 23.3.*

- Cinch periodically conducted product and sales meetings for Gerber's personnel. *Affidavit of Robert J. Gerber ¶ 35; see Agreement ¶ 24.0; 2000 Agreement ¶ 23.6.*

- Gerber submitted all printed material to Cinch for approval prior to reproduction or release where Cinch, its products or trademarks were involved. *Affidavit of Robert J. Gerber ¶ 36; see Agreement ¶ 24.0; 2000 Agreement ¶ 23.13.*

- Upon termination by Gerber solely for its convenience, Cinch would repurchase Gerber's unsold inventory of Program Products. Cinch would pay Gerber the original price Gerber

paid for the items less a ten percent (10%) restocking charge. *Affidavit of Robert J. Gerber ¶ 37; see Agreement ¶¶ 28.1, 30.5; 2000 Agreement ¶¶ 27.1, 28.5.*

Cinch cannot point to one substantive aspect of its business relationship with Gerber that was not controlled by the agreements. Pursuant to the Illinois case law cited above, this conduct is sufficient to bind Cinch to the terms of either the Agreement or the 2000 Agreement.

## III.    THE MOTION TO DISMISS SHOULD BE DENIED BECAUSE THE PARTIES DISPUTE MATERIAL FACTS.

Dismissal is inappropriate under a summary judgment standard.[2] "Summary judgment is appropriate only when there are no genuine disputes as to material facts and the movant is entitled to judgment as a matter of law." *Mass. Asset Fin. Corp. v. Harter, Secrest & Emery, LLP*, 220 F.Supp.2d 20, 23 (D. Mass. 2002); see Fed R. Civ. P. 56 (2004). Defendant Cinch alleges that no written agreement exists between the parties. Gerber asserts that there is a written agreement and the parties operated under the terms of this agreement. "The movant has the 'initial responsibility of informing the district court of the basis for its motion, and identifying those portions' of the record showing the absence of a genuine dispute of material fact." *Mass. Asset Fin. Corp.*, 220 F.Supp.2d at 22, quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Cinch has failed its burden of affirmatively showing the absence of a dispute of material fact. Cinch claims only that no signed written agreement exists. Gerber disputes Cinch's claim that no signed written agreement exists, and also asserts that a signed agreement is unnecessary for the parties to be bound by its terms. Whether that assertion is accurate and whether the parties operated under the

---

[2] Cinch introduces Affidavit of Thomas M. Ryan, Jr. in support of its Motion to Dismiss. Accordingly, Defendant's Motion to Dismiss should be treated as a Motion for Summary Judgment because Defendant introduces matters in addition to pleadings. Fed R. Civ. P. 12(c) (2004).

8

terms of the agreements are material disputes that dictate the denial of defendant's Motion to Dismiss.

### Conclusion

For the reasons stated in this Memorandum, Cinch's Motion to Dismiss should be DENED.

Respectfully Submitted,

_____
Mark Engel, Esquire; BBO# 154440
Engel & Schultz, P.C.
125 High Street, Suite 2601
Boston, MA 02210
Telephone: 617-951-9980
Facsimile: 617-951-0048

Date: MAY 28, 2004

### Certificate of Service

I, Mark D. Engel, hereby certify that I served a copy of the above-entitled document on counsel of record for the defendant in the above-entitled case by hand on this 28th day of May, 2004.

_____
Mark D. Engel